FIRST NATIONAL BANK OF DILLONVALE, Appellee,

v.

PROGRESSIVE CASUALTY INSURANCE COMPANY, Appellant.

[Cite as *First Natl. Bank of Dillonvale v. Progressive Cas. Ins. Co.* (1993), 94 Ohio App.3d 368.]

Court of Appeals of Ohio,
Jefferson County.

Nos. 91–J–32, 92–J–15.

Decided Oct. 18, 1993.

Stanley G. Burech, for appellee.

Anthony J. Hartman and Bradford R. Carver, for appellant.

DONOFRIO, Judge.

This matter is presently before this court as a result of the consolidation of two appeals by defendant-appellant, Progressive Casualty Insurance Company, following a jury verdict in the Jefferson County Court of Common Pleas awarding plaintiff-appellee, the First National Bank at Dillonvale, $252,000. Subsequent to

said verdict, the trial court also awarded First National litigation costs in the amount of $4,451.18. It is from these two awards that appellant, Progressive, brings this appeal.

This action originated in the Jefferson County Common Pleas Court by way of a complaint filed by First National alleging that its insurance carrier, Progressive, failed to pay First National under a certain financial institution bond covering employee dishonesty. Charles P. Maleski, a vice president of First National, used his access to bank computers to create numerous fictitious loans in order to convert $282,000 to his personal use. An additional $31,000 of bank customer funds was also diverted to his personal use. Progressive paid $36,000 but denied the balance of the claim under the bond. The aforementioned litigation then resulted.

In its first assignment of error, Progressive contends:

"Because the bank did not lose any money on the fake loans, the jury's verdict in the amount of $252,000.00 was against the manifest weight of the evidence."

This assignment consists of several arguments involving the issue of whether First National was entitled to collect under the financial institution bond in question. The issues presented are (1) whether First National sustained a loss, (2) whether Maleski intended to obtain a financial benefit for himself, and (3) whether Maleski intended for the bank to sustain a loss.

As to the first issue, Progressive contends First National sustained no actual loss but merely a theoretical bookkeeping loss, as no money was withdrawn from the bank.

Because the term "loss" is not defined in the insurance policy, it must be given its plain and ordinary meaning. *Olmstead v. Lumbermens Mut. Ins. Co.* (1970), 22 Ohio St.2d 212, 51 O.O.2d 285, 259 N.E.2d 123. The term "loss," in its ordinary meaning, is defined as "the act or fact of losing: failure to keep possession: deprivation[.]" Webster's Third New International Dictionary (1986) 1338.

The question thus becomes whether the jury's finding that First National suffered a loss was against the manifest weight of the evidence.

It is undisputed that Maleski created fictitious loans, then, via computer, diverted funds from those loans to actual delinquent loan accounts to make it appear that First National had received payments on these loan accounts when, in fact, it had not. The evidence presented at trial indicates that by the time Maleski's scheme was discovered, two hundred thirty-two of the four hundred twenty-two accounts tampered with by Maleski had already been paid off, obviously with the wrong payoff balances and through the diverted funds.

Further testimony by First National vice president Michael Shepard indicated that when a loan customer actually made payments on an account, Maleski diverted the funds to his own account. There is evidence that eighty-eight customers did not continue to make payments on their loans after Maleski's scheme was exposed, and that the collateral used by First National to secure those loans had decreased in value because of the lapse of time.

Pursuant to *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 261–262, 376 N.E.2d 578, 579:

"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."

When coupled with the presumption that the findings of the trier of fact are correct, see *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273, we find there is ample evidence to support the jury's finding that First National incurred a loss for the value of the fictitious loans and funds embezzled by Maleski as a result of his actions.

█ The next two issues raised by Progressive are whether the evidence demonstrates that (1) Maleski had the intent to obtain a financial benefit for himself or for another person, and (2) Maleski had the intent to cause the insured to sustain a loss. The intent to do both is a prerequisite for payment pursuant to Section (A) of the Insuring Agreement. Progressive relies on Maleski's own testimony that he did not intend to cause a loss for the bank, that he just wanted to prove that he was doing a good job by bringing past due loans current, and that he continued to pursue past due customers even after making their accounts appear current. Progressive also argues there is no evidence that indicates Maleski intended to benefit himself or others by his actions.

Maleski admitted that he could think of many ways in which the bank lost money on the fictitious loans, and that he knew it was dishonest and fraudulent to create fictitious loans. Maleski admitted that he kept actual loan payments made by customers for himself, that he kept no record of such payments, and that if the bank was later told by a customer that the customer had fully paid his account, the bank would have to bear the loss. Maleski also admitted that he took measures to avoid drawing the attention of bank regulators who might discover his scheme.

Based on the record in this case, we find the trier of fact could have properly inferred that (1) First National suffered a loss, (2) Maleski intended to obtain a financial benefit for himself, and (3) Maleski intended for the bank to sustain a loss.

" * * * Since all persons are presumed to have intended the natural and probable consequences of their acts, if one is using the means calculated to produce an injury, the law presumes he or she intended to produce it." 88 Ohio Jurisprudence 3d (1989) 341–342, Torts, Section 41.

The same proposition is echoed in 42 Ohio Jurisprudence 3d (1983) 420–421, Evidence and Witnesses, Section 159.

Once again, pursuant to the holdings of *C.E. Morris Co. v. Foley Constr. Co.*, *supra*, and *Seasons Coal Co. v. Cleveland, supra*, the jury's findings are not against the manifest weight of the evidence. Progressive's first assignment of error is found to be without merit.

■ In its second assignment of error, Progressive contends:

"Because the uncontroverted evidence demonstrated that $35,000 to $50,000 of the $252,000 award represented non-reimbursable interest, the jury's verdict is against the manifest weight of the evidence."

Progressive argues any accrued interest on any fictitious loan was "potential income" and excluded from recovery by the policy. Progressive contends First National's expert, Jeffrey Robb, testified that as much as $55,000 in non-reimbursable interest could have accrued on the fictitious loans.

As First National correctly indicates, the term "potential income" is not defined in the policy. First National then argues that Maleski used the fictitious loans he created to pay older fictitious loans. First National argues that there were $313,000 worth of fictitious loans and other embezzlements by Maleski on the books when his scheme was discovered. The $252,000 jury award, First National argues, is consistent with the $313,000, less a $25,000 deductible and less the $36,000 which Progressive had already paid under the policy.

We believe First National's argument to be in accordance with the holding in *Bank of Huntingdon v. Smothers* (Tenn.App.1981), 626 S.W.2d 267. When fictitious loans are created and used to pay old interest on pre-existing loans, the face value of the fictitious loans, plus interest accrued on them, is the amount of loss to the bank. The fact that interest payments on pre-existing loans were made with the funds does not render those interest payments potential income.

We agree with First National's argument. The potential income exclusion in the policy cannot be used to reduce First National's recovery under the policy on the basis of what the proceeds of the fictitious loans were used for. Further, there is no indication that unpaid interest on the fictitious loans was included in the jury award rendered in this case.

Progressive fails to demonstrate that any potential income was incorrectly awarded by the jury contrary to the manifest weight of the evidence. Progressive's second assignment of error is found to be without merit.

■ In its third assignment of error, Progressive contends:

"The trial court erred by instructing the jury to construe Progressive's bond 'in favor of providing coverage.'"

Progressive argues such an instruction is improper under any circumstances, especially in this case, as the policy provisions were not ambiguous. Progressive contends the evidence reveals it did not draft the bond and the charge to the jury was overly broad, misleading, and prejudicial. Progressive contends the interpretation of a written agreement against the drafter is only a tool of construction to be used by courts in interpreting ambiguous provisions in an insurance contract.

First National correctly argues that Progressive takes this instruction, a single sentence from some twenty-eight pages of jury instructions, out of context. As First National indicates, when instructing the jury to construe the bond issued by Progressive in favor of providing coverage for the dishonest acts of Maleski, the trial court was telling the jury how to consider "dishonest and fraudulent," as the terms, which the trial court found at page 907 of the transcript, are ambiguously used in the policy. Since the bond in question was an insurance policy, Ohio law requires that ambiguous terms are to be construed liberally in favor of the insured. *Buckeye Union Ins. Co. v. Price* (1974), 39 Ohio St.2d 95, 68 O.O.2d 56, 313 N.E.2d 844.

"Reversible error ordinarily can not be predicated upon one paragraph, one sentence or one phrase of the general charge to the jury. Where the court's charge to the jury, considered as a whole, is not prejudicial to the objecting party, no reversible error results from a misstatement or ambiguity in a portion thereof." *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 44 O.O.2d 18, 238 N.E.2d 563, paragraph three of the syllabus.

Based on this holding, any error that might have been committed by the trial court is harmless. We do not find the instruction in question was improper or prejudicial to Progressive. Progressive's third assignment of error is found to be without merit, as it fails to demonstrate error on the part of the trial court in its charge to the jury.

■ In its fourth assignment of error, Progressive argues:

"Because the Bank's claim involved loans, and because the bond required that the Bank prove collusion between Maleski and the loan customers, the jury's verdict was against the manifest weight of the evidence. Moreover, the trial

court erred in not instructing the jury on the 'collusion' and financial benefit provision of the bond."

Progressive breaks this assignment of error down into two arguments, the first being that:

"The jury's verdict was against the manifest weight of the evidence because Maleski was not in collusion with the actual loan customers nor did he receive a financial benefit as was specifically required by the terms of the bond."

Progressive cites the pertinent portion of the policy in question, which states:

"However, if some or all of the Insured's Loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received in connection therewith, a financial benefit with a value of at least $2,500."

This provision clearly states that collusion and financial benefit exclusions apply only "if some or all of the Insured's loss results directly or indirectly from Loans." The jury specifically found in its answer to jury interrogatory four that First National's losses did not result from loans. First National argues that the jury relied heavily on evidence of losses from over four hundred pre-existing loan accounts that Maleski tampered with. Here, Progressive argues that any losses incurred by First National on those accounts would be the result of loans. We disagree. From the verdict in this case and the jury's answer to interrogatory four, we are of the opinion that the jury considered all losses suffered by First National to be the result of Maleski's theft, not of any loans.

The purpose of excluding coverage for "loans" in this type of an insuring agreement is to eliminate coverage for bad loans. The purpose for a bond is not to insure a bank's lending practices. This was not the case here. We find there is substantial evidence to support the finding by the jury.

■ In the second portion of its argument under this assignment of error, Progressive contends:

"The trial court erred in not instructing the jury on the 'collusion' provision of the bond."

Progressive presented the trial court with a proposed instruction which outlines the provision of Insuring Agreement (A) as it relates to collusion and financial benefit if a loss results from genuine past due loans. Progressive argues that it was pertinent that there was substantial evidence presented on the issue of losses from pre-existing loans, and the trial court confused the jury by giving interrogatory four, as it asked whether First National's losses resulted from loans, without having given the requested instruction.

Based on our previously stated view as to whether any loss sustained by First National could have resulted from loans, we find the trial court did not err in failing to give the requested instruction. It would have been misleading for the trial court to give the requested instruction. Moreover, although we do not ignore the issue concerning the propriety of the trial court's decision to give interrogatory four to the jury, we feel the jury's answer to that interrogatory renders harmless any error by the trial court's refusal to give the collusion instruction, as coverage could not be excluded under that instruction unless First National sustained a loss as a result of the loans. Progressive's fourth assignment of error is found to be without merit.

In its fifth assignment of error, Progressive contends:

"The trial court erred in overruling Progressive's Motion for Summary Judgment and Motions For Directed Verdict."

Progressive cites *Natl. Bank of Fulton Cty. v. Haupricht Bros., Inc.* (1988), 55 Ohio App.3d 249, 564 N.E.2d 101, for the proposition that, when ruling on a question of error from a denied motion for directed verdict, a reviewing court must consider whether competent evidence supports the verdict in favor of the prevailing parties without considering the weight and credibility of the evidence. Progressive then argues that it established the absence of any actual loss sustained by First National and was therefore entitled to summary judgment or a directed verdict as a matter of law.

Our resolution of the previous assignments of error supports our finding that Progressive's fifth assignment of error lacks merit and it is therefore overruled.

In its sixth assignment of error, Progressive contends:

"The trial court abused its discretion in overruling Progressive's motion for new trial."

Progressive relies on its previously asserted errors in support of its argument that the trial court's denial of its motion for a new trial demonstrated an unreasonable, arbitrary or unconscionable attitude and therefore constitutes an abuse of discretion.

Once again, based on our resolution of the previous assignments of error, we find this assignment of error to lack merit.

In its seventh assignment of error (labeled Assignment of Error 1 in Progressive's brief of case No. 92–J–15), Progressive contends:

"The trial court erred in awarding its costs, expenses incurred in taking and transcribing depositions."

Progressive cites *Barrett v. Singer Co.* (1979), 60 Ohio St.2d 7, 14 O.O.3d 122, 396 N.E.2d 218, for the proposition that, absent extraordinary circumstances,

deposition expenses are not recoverable. Progressive then cites *Jones v. Pierson* (1981), 2 Ohio App.3d 447, 2 OBR 542, 442 N.E.2d 791, in arguing that recoverable litigation expenses are funds expended that are necessary and vital to litigation, and that depositions used only for impeachment purposes at trial are generally not so vital as to warrant being taxed as costs.

In the present case, First National obtained the trial court's order of reimbursement for the cost of depositions of Charles Maleski, Timothy Sukel, Douglas Austin, and Wayne Camp. Progressive argues that these depositions were not offered as evidence at trial and Camp was never called as a witness, even though Austin along with Camp were identified as expert witnesses. Progressive cites *Moore v. Gen. Motors Corp.* (1985), 18 Ohio St.3d 259, 18 OBR 314, 480 N.E.2d 1101, as holding that experts' depositions may be taxed as costs only when they are introduced as evidence at trial, which Austin's and Camp's were not.

In *Bookatz v. Kupps* (1987), 39 Ohio App.3d 36, 38–39, 528 N.E.2d 961, 964, the Eighth District Court of Appeals held:

"This court, in *Jones v. Pierson* (1981), 2 Ohio App.3d 447, 449 [2 OBR 542, 544–545, 442 N.E.2d 791, 794–795] * * * established a two-prong analysis which must be applied to a motion to tax an expense as costs and specifically held that:

" 'In ruling upon a motion to tax an expense as a cost, therefore, a court must first determine whether the item is a necessary litigating expense. In making this determination, the focus of the inquiry is whether an itemized expense, not declared taxable by statute, was so vital to the case that it may no longer be viewed as a mere personal expense but must be characterized as a necessary litigating expense.

" 'The second step of the court's determination of taxability is to decide whether a litigating expense will be awarded as a cost. * * *'

" * * *

" 'A trial court's discretion to disallow costs is limited to refusing to tax a litigating expense as a cost only where such expense is an unusual expense in type or amount which because of the prevailing party's conduct it is inequitable to assess against the non-prevailing party.' * * * *Horne v. Clemens* (1985), 25 Ohio App.3d 44, 46 [25 OBR 118, 119–120, 495 N.E.2d 441, 443–444]."

In *Jones v. Olcese* (1991), 75 Ohio App.3d 34, 42, 598 N.E.2d 853, 858, the court quoted one of the few guiding opinions by the Ohio Supreme Court on the subject of assessing costs: " ' "[The] Court has discretion as to how costs of an action shall be assessed." *State ex rel. Fant v. Regional Transit Auth.* (1990), 48 Ohio St.3d 39 [548 N.E.2d 240].' " In *Jones v. Olcese, supra,* 75 Ohio App.3d at 43, 598 N.E.2d at 859, the court followed the two-prong test set forth in *Jones v. Pierson,*

*supra,* and quoted *Horne v. Clemens, supra,* 25 Ohio App.3d at 47, 25 OBR at 120, 495 N.E.2d at 444:

" 'Civ.R. 54(D) allows assessment of the cost of deposition if allowed by the trial court. Certainly taking depositions is good legal practice and considered essential to the proper preparation for trial.' "

██ In the present case, the trial court taxed as costs against Progressive the court reporter's fee for the depositions of First National's experts Charles Maleski and Timothy Sukel. These depositions were filed and used by First National in opposition to Progressive's motion for summary judgment. We find the trial court did not abuse its discretion in taxing the costs of deposing those two witnesses.

As to the deposition costs of Progressive's experts, Douglas Austin and Wayne Camp, the trial court did not abuse its discretion in taxing them to Progressive. Consistent with the foregoing case law, especially that found in *Horne v. Clemens, supra,* it was good legal practice for First National to take such depositions. We find Progressive's seventh assignment of error to be without merit.

██ In appellant's eighth assignment of error (labeled Assignment of Error 2 in Progressive's brief of case No. 92–J–15), Progressive contends:

"The trial court erred in taxing as costs expenses incurred in deposing witnesses."

Progressive refers to the flight to Toledo by First National's counsel to depose Douglas Austin, the car rental and parking fees in Toledo, the expert fee paid to Douglas Austin, and mileage to Cleveland by First National's counsel to depose Wayne Camp.

Progressive cites *Gold v. Orr Felt Co.* (1985), 21 Ohio App.3d 214, 21 OBR 228, 487 N.E.2d 347, and *Shipman v. Alamo Rent–A–Car, Inc.* (1990), 70 Ohio App.3d 333, 590 N.E.2d 1385, as holding that expert witness fees are not taxable costs to be charged against a losing party. Progressive argues the trial court had no authority to award the incidental expenses mentioned above.

In light of the holdings in *Shipman, supra,* and *Gold, supra,* we find that in allowing the trial court the discretion to assess the costs previously set forth, it is not necessary to place absolute constraints on such discretion when specific costs, such as expert witness fees, are at issue. All costs should be assessed under the two-prong test previously explained. Progressive would have to show the trial court abused its discretion within the parameters of that two-prong test in order to show error on the part of the trial court. Progressive failed to demonstrate an abuse of discretion in taxing the expert fees and incidental expenses in deposing

the witnesses as costs. Progressive's eighth assignment of error is therefore found to be without merit.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

Cox, P.J., and O'NEILL, J., concur.